IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| GLENDA SUE GARDNER, Individually and as Personal Representative of the Estate of Jacob Gardner, and DAVID GARDNER, <br><br> Plaintiffs, <br><br> vs. <br><br> FREDERICK D. FRANKLIN, et al., <br><br> Defendants. | 4:21-CV-3145 <br><br> MEMORANDUM AND ORDER |

## I. INTRODUCTION

The murder of George Floyd by a Minneapolis police officer sparked civil rights demonstrations across the nation. Omaha resident James Scurlock was among the demonstrators. Scurlock was shot and killed by Jake Gardner outside the downtown Omaha bar that Gardner owned. A Douglas County, Nebraska grand jury indicted Gardner on several charges, including manslaughter. A few days later, Gardner committed suicide. The plaintiffs in this case are Gardner's parents, suing Douglas County and others for allegedly violating Gardner's civil rights and causing his death.

Gardner's parents are undoubtedly bereaved, and of course they have every right to be. The events that led to this case were tragic for Gardner's family and for Scurlock's, and the loss of a child is devastating under any circumstances. But not all tragic circumstances ultimately lead to legal liability. This is one of those instances. For the reasons that follow, the lawsuit filed by plaintiffs' counsel lacks legal merit under both federal and state law. As a result, the Court will grant the defendants' motions to dismiss the plaintiffs' complaint.

## II. STANDARD OF REVIEW

This case is still at the pleading stage, which means that, for now, the Court is required to assume that the plaintiffs' allegations are true. Specifically, the Court must assume the truth of the plaintiffs' factual allegations, and a well-pleaded complaint may proceed, even if it strikes a savvy judge that actual proof of those facts is improbable, and that recovery is very remote and unlikely. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see* Fed. R. Civ. P. 8(a)(2). Determining whether a complaint states a plausible claim for relief will require the reviewing court to draw on its judicial experience and common sense. *Iqbal*, 556 U.S. at 679. The facts alleged must raise a reasonable expectation that discovery will reveal evidence to substantiate the necessary elements of the plaintiffs' claim. *See Twombly*, 550 U.S. at 545.

This standard does not require detailed factual allegations, but it demands more than an unadorned accusation. *Iqbal*, 556 U.S. at 678. The complaint must provide more than labels and conclusions; and a formulaic recitation of the elements of a cause of action will not suffice. *Twombly*, 550 U.S. at 555. And while the Court must take all of the factual allegations in the complaint as true, it is not bound to accept as true a legal conclusion couched as a factual allegation. *Id*.

## III. BACKGROUND

George Floyd was killed by a Minneapolis police officer on May 25, 2020, sparking nationwide protests. Filing 1 at 6. Gardner owned "The Hive," a bar in downtown Omaha near some of the protests. *See* filing 1 at 6-7. On May 30,

with unrest continuing, Gardner went to The Hive, allegedly "to protect[] his business from rioters and looters." Filing 1 at 7. He was armed with a pistol. Filing 1 at 7.

According to the complaint, the bar's windows were broken at about 10:40 p.m. by what Gardner believed to have been bullets. Filing 1 at 7. The plaintiffs allege that Scurlock and others began throwing projectiles at The Hive and other businesses. Filing 1 at 7. Gardner, Gardner's father, and The Hive's bartender came outside to photograph the damage, and a confrontation ensued with Scurlock and others. Filing 1 at 7.

According to the complaint—and again, at this point in the proceedings the Court is required to assume these allegations are true—Gardner's father was assaulted. Filing 1 at 7. Gardner moved to defend his father and was tackled, so he drew his pistol and fired what was allegedly a warning shot. Filing 1 at 7. Scurlock jumped on Gardner's back and, the complaint says, "aggressively choked [him] for a sustained period of time"—specifically, for at least 18 seconds. Filing 1 at 7-8. Gardner, "fearing that he was about to lose his consciousness and fearing for his life," shot Scurlock. Filing 1 at 8. Scurlock later died as a result of his injuries. Filing 1 at 8.

Douglas County Attorney Don Kleine reviewed the evidence and announced his decision not to prosecute Gardner for the shooting, having concluded that Gardner acted in self-defense. Filing 1 at 8. That decision inspired further protests, so a week later, former Assistant U.S. Attorney Fred Franklin was appointed to act as a special prosecutor and a grand jury was convened. Filing 1 at 8. (Under Nebraska law, "upon request of the county attorney for good cause," a state court may appoint an attorney to act as county attorney in any investigation." Neb. Rev. Stat. § 23-1205.)

On September 15, the grand jury returned an indictment against Gardner for manslaughter, terroristic threats, attempted assault, and use of a

weapon to commit a felony. Filing 1 at 8. Franklin appeared at a press conference to announce the charges, and his remarks at the press conference are the basis for this lawsuit. *See* filing 1 at 12-20.

According to the complaint, Franklin's remarks included "untrue and biased statements," and Franklin "selectively reveal[ed] information from the grand jury proceedings which were designed to destroy [Gardner's] image and prejudice the community against him." Filing 1 at 8. The complaint alleges:

- Franklin called the case against Gardner "almost slam dunk."

- Franklin said Gardner's conduct, including texts and Facebook messages from that night, showed he intended to kill. "In fact, [Gardner] had made no such statements and had already called the police for assistance once before."

- Franklin said the evidence against Gardner came "primarily from Jake Gardner, himself."

- Franklin refused to comment on whether or not racist comments had been found on Gardner's phone and said the decision to prosecute wasn't made "because [Gardner] 'may or may not have been a racist' because 'being a racist is not against the law.' These statements and omissions combined to falsely imply that [Gardner] was a racist. In fact, there were no racist comments on Gardner's phone."

Filing 1 at 9.

The complaint alleges that the combined effect of these remarks was to "taint[] the available jury pool to such an extent that it would have been impossible for [Gardner] to receive a fair trial." Filing 1 at 9. And, according to the complaint, both Kleine and two unnamed investigators assisting Franklin knew that Franklin intended to make "false and misleading statements to the media . . . and willfully or negligently failed to prevent" them. Filing 1 at 9.

Gardner, according to the complaint, received death threats after the press conference, and experienced depression and emotional distress. Filing 1

at 10. Gardner allegedly suffered from post-traumatic stress disorder and "traumatic brain injury" from his military service. Filing 1 at 11. Gardner committed suicide on September 20, allegedly "[a]s a result of the extreme mental anguish suffered . . . because of the false statements made by [] Franklin and his loss of a chance for an impartial jury." Filing 1 at 11.

The complaint asserts six purportedly separate claims for relief against six purportedly separate defendants. *See* filing 1. The defendants are Franklin, Kleine, and the two John Doe investigators allegedly assisting Franklin (all in their official and individual capacities), along with Douglas County and "the Douglas County Attorney's Office." Filing 1 at 4-5. And the claims for relief are:

1. Conspiracy "to Deprive Mr. Gardner of His Right to a Fair Trial and Due Process," against all defendants;

2. Deprivation of the Sixth Amendment right to an impartial jury, against all defendants;

3. Deprivation of the Fourteenth Amendment right to due process, against all defendants;

4. "Constitutional Claim for *Brady* Rule Violation Against All Defendants Pursuant to *Bivens v. Six Unknown Names Agents of Federal Bureau of Narcotics,*" against all defendants;

5. Wrongful death, against all defendants; and

6. "Failing to Prevent the Deprivation of Jake Gardner's Rights," against all defendants except Franklin.

Filing 1 at 12-21. Kleine and Douglas County have moved to dismiss the claims against them. Filing 12. And Franklin and his two investigators have separately moved to dismiss the claims against them. Filing 21.

IV. DISCUSSION

To begin with, it will be helpful to clarify who the parties are. First, the defendants. The "Douglas County Attorney's Office" isn't a separate entity capable of being sued—it's just an office of Douglas County. *See Parsons v. McCann*, 138 F. Supp. 3d 1086, 1116 (D. Neb. 2015). And the claims against Kleine, Franklin, and the Doe defendants in their official capacities are also just claims against Douglas County. *See id*. Accordingly, the defendants are actually Kleine, Franklin, and two John Does—all in their individual capacities—and Douglas County. *See id*.

The plaintiffs also require some clarification. Both of Gardner's parents are purportedly suing as individuals and next of kin. Filing 1 at 4. And Gardner's mother is the personal representative of Gardner's estate. Filing 1 at 4. But as the defendants correctly note, only Gardner's estate is a proper plaintiff here. *See Mader v. United States*, 654 F.3d 794, 801 (8th Cir. 2011); *see also Landrum v. Moats*, 576 F.2d 1320, 1323 n.2 (8th Cir. 1978); *see generally Anderson v. City of Minneapolis*, 934 F.3d 876, 880 (8th Cir. 2019). And in fact, the plaintiffs' counsel fails to respond to this argument. *See* filing 22 at 3 n.1; filing 23; filing 24 at 6. Accordingly, to the extent that the plaintiffs' claims are asserted by Gardner's parents in their individual capacities, those claims will be dismissed for lack of standing.[1]

---

[1] To be clear, though: Had any claim been sufficiently alleged and eventually proved, this would not preclude damages being awarded to Gardner's parents for their loss. *See, e.g., Brandon ex rel. Est. of Brandon v. Cnty. of Richardson*, 624 N.W.2d 604, 625 (Neb. 2001). Their lack of standing is based on the Nebraska wrongful death statutes, not any lack of injury. *See Selders v. Armentrout*, 207 N.W.2d 686, 687-88 (Neb. 1973).

### 1. FAIR TRIAL CLAIMS

Although pleaded separately, the plaintiffs' first, second, third, and sixth claims for relief are intertwined: All center on the alleged violation of Gardner's right to a fair trial—specifically, to an impartial jury. The second claim for relief squarely asserts that issue under the Sixth Amendment. *See* filing 1 at 13-15. The third claim for relief is framed in terms of Fourteenth Amendment due process—whether it's meant to be a procedural or substantive due process claim is a mystery—but the only alleged infringement of due process is "tainting the jury and inflaming the community against [Gardner]." Filing 1 at 15-16. The first claim for relief is just an alleged conspiracy to violate Sixth and Fourteenth Amendment rights. Filing 1 at 12-13. And the sixth claim for relief alleges that all the defendants except Franklin failed to stop Franklin from acting. Filing 1 at 19-21.

### (a) Justiciability

The defendants argue that Gardner's right to an impartial jury couldn't have been violated because the case against him never went to trial. Filing 13 at 5-8; filing 22 at 5-9. Of course, they're absolutely right. The Eighth Circuit has clearly held that "[t]he right to be tried by an impartial jury, by its very nature, can only be afforded or denied in the context of a criminal trial." *Kaylor v. Fields*, 661 F.2d 1177, 1181 (8th Cir. 1981).

In *Kaylor*, the plaintiffs sued the local prosecutor for allegedly disseminating accusations to the press "in an attempt to deprive them of their right to an impartial jury panel in the event of a criminal prosecution." *Id*. at 1180-81. The district court dismissed their claim and the Eighth Circuit affirmed that decision, finding that the claim wasn't ripe because the plaintiffs hadn't yet been injured. *Id*. at 1181. The Court of Appeals explained that until the plaintiffs had been subjected to a criminal trial, the Court could only

speculate as to whether their Sixth Amendment rights were being denied. *Id*. And, the Court of Appeals noted, if charges were brought, there were "ample means, including voir dire and a motion for change of venue, by which to vindicate this right in the state courts." *Id*.

The plaintiffs' counsel responds to *Kaylor* by asserting that "here on the contrary, the malicious statements were the cause of Gardner's death." Filing 15 at 12. Well, maybe, maybe not—but either way, that doesn't support a *Sixth Amendment* claim. It's also hard to square counsel's insistence that "**it is NOT *speculative* to conclude that Gardner's right to trial by impartial jurors was denied**," filing 15 at 14 (emphasis in original) with the later argument that "we can only *imagine* the implications and the prejudicial effect on the trial because of the possible bias on the jury," filing 15 at 23-24 (emphasis supplied).

Counsel also insists that there would have been no way to mitigate the prejudice he claims was caused by Franklin's remarks. Filing 15 at 14-15. That legal conclusion is untenable. The right to an impartial jury doesn't require ignorance. *United States v. Tsarnaev*, 142 S. Ct. 1024, 1034 (2022).

> Notorious crimes are almost, as a matter of necessity, brought to the attention of those informed citizens who are best fitted for jury duty, and a trial court protects the defendant's Sixth Amendment right by ensuring that jurors have no bias or prejudice that would prevent them from returning a verdict according to the law and evidence.

*Id*. (cleaned up).

*Tsarnaev* is illustrative because, in that case, the Supreme Court described the trial court's careful jury-selection process and deemed it "both

eminently reasonable and wholly consistent with this Court's precedents" regarding a defendant's Sixth Amendment rights. *Id*. at 1034-35. So, the Court concluded, the Sixth Amendment "guaranteed [Tsarnaev] a fair trial before an impartial jury" and "[h]e received one." *Id*. at 1041. That, in the prosecution of some of the most infamous crimes in recent memory: The deadly bombing of a world-famous public event by terrorists, a subsequent crime spree and regional manhunt that included a lockdown of the entire Boston metropolitan area, and all of the concomitant media attention and political hyperbole. *See United States v. Tsarnaev*, 968 F.3d 24, 36-39 (1st Cir. 2020), *rev'd*, 142 S. Ct. 1024. If careful jury selection could permit that case to be tried in the community where the crime occurred, the Court is confident that an impartial Douglas County jury could have been selected regardless of Fred Franklin's press conference.

### (b) Due Process

A Fourteenth Amendment claim would fare no better, even if not specifically contingent on going to trial. A general interest in one's reputation isn't a liberty or property interest protectible by the Fourteenth Amendment. *Wade v. Goodwin*, 843 F.2d 1150, 1152 (8th Cir. 1988). Neither the complaint nor the plaintiffs' counsel have identified any sort of additional pre- or post-deprivation procedural due process to which they think Gardner was entitled. And a substantive due process violation requires the plaintiffs to allege that a fundamental right was violated and that the defendant's conduct shocks the conscience. *Stockley v. Joyce*, 963 F.3d 809, 818 (8th Cir. 2020).

In *Stockley*, the plaintiff was a former police officer who shot and killed a drug trafficking suspect. *Id*. at 815. The state circuit attorney initially declined to prosecute the plaintiff, but after public protests she decided to charge the plaintiff with murder. *Id*. at 815-16. The plaintiff was acquitted and then sued the prosecutor and other city officials. *Id*. at 816. Among other

things, he claimed that he had been denied substantive due process when the prosecutor made allegedly "false public statements" about the evidence she said supported her decision. *Id*. at 818. But the Eighth Circuit found that the plaintiff had failed to state a claim for relief, explaining:

> Even assuming [the prosecutor's] statements somehow impacted [the plaintiff's] constitutional rights to an impartial jury and fair criminal proceedings, such conduct is a routine part of a prosecutor's job and, even considering the representations made by [the prosecutor], was not "the sort of brutal and inhumane abuse of official power that shocks the conscience." Thus, [the prosecutor's] conduct of making public statements regarding her decision to charge [the plaintiff] and the evidence supporting that decision does not remotely rise to the conscience-shocking level.

*Id*. at 819. *Stockley* is squarely on point here.

The Court notes that Franklin's remarks are fairly characterized as his opinions about the evidence. *See* filing 1 at 9. Franklin isn't alleged, for instance, to have made any statements of fact that were objectively falsifiable. A grand jury had found probable cause to indict Gardner, and the plaintiffs do not attack that finding. Franklin's opinions about the government's evidence were nothing more than that. And Franklin's confidence in the government's evidence isn't shocking to the conscience.

### (c) Conspiracy to Violate Civil Rights

The defendants offer more reasons that the plaintiffs' conspiracy claims fail, and again the defendants are correct. The plaintiffs' first claim for relief is expressly premised on 42 U.S.C. § 1985(3), which provides a cause of action

if "two or more persons . . . conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws. . . ." And the sixth claim for relief is premised on 42 U.S.C. § 1986, which provides a cause of action against anyone who has knowledge of a § 1985 conspiracy and fails to prevent it. But there are several fundamental problems with these claims.

### (i) *42 U.S.C. § 1985*

#### a. Failure to Allege Underlying § 1985 Claim

First, § 1985(3) doesn't provide an independent cause of action: It applies only if a conspiracy exists under one of § 1985's other subsections. *Liscomb v. Boyce*, 954 F.3d 1151, 1155 (8th Cir. 2020). No claim was alleged in the complaint under § 1985(1), (2), or (3), and plaintiffs' counsel doesn't identify one in the briefs either. *See* filing 1; filing 15; filing 23.

> In general terms, section 1985 proscribes five different types of conspiracies: (1) conspiracies to interfere with the performance of official duties by federal officers (section 1985(1)); (2) conspiracies to interfere with the administration of justice in federal courts (first clause of section 1985(2)); (3) conspiracies to interfere with the administration of justice in state courts (second clause of section 1985(2)); (4) private conspiracies to deny any person enjoyment of "equal protection of the laws" and "equal privileges and immunities under the laws" (first clause of section 1985(3)); and (5) conspiracies to interfere with the right to support candidates in federal elections (second clause of section 1985(3)).

*Harrison v. Springdale Water & Sewer Comm'n*, 780 F.2d 1422, 1429 (8th Cir. 1986). Because no federal officials were involved here, that limits the plaintiffs to the third and fourth categories. *Id.*; *see Liscomb*, 954 F.3d at 1155. And because the plaintiffs do not allege Gardner belonged to a class that suffers from invidious discrimination, they fail under the fourth category as well. *Harrison*, 780 F.2d at 1429.

That leaves the third category—and that's also the closest to the plaintiffs' theory of the case—but that still would require the plaintiffs to show, "among other things, that there was an actual conspiracy between multiple persons, and that the conspiracy was fueled by some class-based, invidiously discriminatory animus." *Keefe v. City of Minneapolis*, 785 F.3d 1216, 1224 (8th Cir. 2015) (cleaned up); *see Harrison*, 780 F.2d at 1429. There's no allegation of class-based, discriminatory animus in this case. *See* filing 1.

The response to this argument from plaintiffs' counsel is not helpful. The defendants clearly articulated the § 1985 requirement of discriminatory animus, and cited counsel to the relevant authority. Filing 13 at 9-10 filing 22 at 9-10. Plaintiffs' counsel responded with a section of his brief captioned, "Plaintiffs sufficiently alleged the existence of a discriminatory animus." Filing 15 at 20; filing 23 at 17. The two paragraphs that follow are:

> Defendant states that neither of Plaintiffs [sic] assertions of deprivation of "[Gardner's] rights to an impartial jury and due process of law." [sic] can be established because (1) there can be no deprivation of Gardner's right to an impartial jury without a trial and conviction, and (2) Plaintiffs' claim that Defendants conspired to deprive Gardner of due process is not actionable under § 1985(3).
>
> To succeed on the conspiracy claim, we must demonstrate that the alleged conspiracy to deprive Gardner of his right to an

impartial jury in fact had that result. [*A.J. ex rel. Dixon v. Tanksley*, 822 F.3d 437, 444 (8th Cir. 2016)] (defendants must have committed an underlying constitutional violation to be liable for civil conspiracy). As addressed supra, Defendant was fairly knowledgeable of the implications of his statements, and thus, it was not difficult to imply the resulted impact on the jury. The fact is that Gardner was charged after he was not prosecuted by the local prosecutors, and the special prosecutor driven by the public not only charged him with crimes that had proven defenses, but they also made statements to picture Gardner as a racist and a killer. It has been said that words have weight, thus, Defendant knew the weight of those words when he made such statements.

Filing 23 at 18.

The Court's not sure what to make of that. But it suffices to say that despite the point heading, there's nothing there even remotely resembling a discussion of discriminatory animus.

### b. Failure to Allege Agreement

Even if that wasn't enough—and it surely is—the complaint also fails to sufficiently allege the existence of a conspiracy in the first place. Again, there's well-established black-letter law: To state a claim for conspiracy under § 1985(3), "the plaintiff must allege with particularity and specifically demonstrate with material facts that the defendants reached an agreement." *Johnson v. Perdue*, 862 F.3d 712, 717-18 (8th Cir. 2017) (quoting *City of Omaha Emps. Betterment Ass'n v. City of Omaha*, 883 F.2d 650, 652 (8th Cir. 1989)); *Mendoza v. United States Immigr. & Customs Enf't*, 849 F.3d 408, 421 (8th Cir. 2017) (quoting *Davis v. Jefferson Hosp. Ass'n*, 685 F.3d 675, 685 (8th Cir.

2012)). Mere speculation or conjecture is insufficient to prove a civil conspiracy. *Mendoza*, 849 F.3d at 421.

So, for instance, in *Johnson* the Eighth Circuit agreed with the district court that the plaintiff had failed to allege a civil conspiracy, explaining that "the complaint includes no facts suggesting the individual defendants reached an agreement; instead, it relies on conclusory allegations that the defendants conspired 'through mutual decisions and correspondence' and 'acted in concert and with a mutual understanding.'" 862 F.3d at 718. Those allegations were insufficient because the plaintiff "was unable to point to at least some facts which would suggest that [defendants] reached an understanding to violate his rights." *Id.* (cleaned up). And in *Mendoza*, the plaintiff's civil conspiracy claim was properly dismissed because despite circumstantial evidence that the defendants had a history of cooperation, "[m]ere cooperation between entities is not evidence of *specific facts* that show a meeting of the minds." 849 F.3d at 422. The Court of Appeals also noted the absence of any motive for the defendants to conspire. *See id*.

Here, the complaint only alleges the following: "Defendants were aware of and discussed Defendant Franklin's statements to be made to the press on September 15, 2020, which were designed to and did cause Mr. Gardner to be deprived of his Sixth and Fourteenth Amendment rights." Filing 1 at 13. Other than replacing words like "correspondence" with the word "discussed," that's substantially indistinguishable from the allegations found wanting in *Johnson*, 862 F.3d at 718.

In response, plaintiffs' counsel asserts:

Here, Defendants were acting in consonance and even if only one of them was the one making the statements that does not mean that it is less probable that they were conspiring to violate Gardner

- 14 -

[sic] rights, one by making the statements and the other by abstaining to make an action when it could, or just by not taking an action to mitigate the injury.

Filing 23 at 18-19. But the fact that only one of them was acting *does* make it less probable that they were conspiring. Nor does anything plaintiffs' counsel said point to any "*specific facts* that show a meeting of the minds." *Mendoza, 849 F.3d at 422*. Instead, counsel offers nothing more than conclusory allegations of conspiring. *See Johnson*, 862 F.3d at 718.

Plaintiffs' counsel also suggests that "[t]here was a conspiracy looking at the fact that Gardner was not charged at the beginning and only *after* the public started to pressure, the District Attorney's office charged Gardner and brought a special prosecutor to do so (*Emphasis* in the fact that local prosecutors did not bring charges upon Gardner)." Filing 15 at 20 (emphasis in original). But there's no explanation for Kleine's purported motive to conspire with Franklin to deny Gardner a fair trial, after Kleine had initially decided not to press charges, and then had a special prosecutor appointed to serve in his place. *Cf. Mendoza*, 849 F.3d at 422. There is simply nothing in the plaintiffs' pleading or briefing, other than conclusory assertions, to show a conspiracy.

### (ii) *42 U.S.C. § 1986*

Section 1986 provides that

Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to

do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act. . . .

But liability under § 1986 is dependent on *actual knowledge* by a defendant of the wrongful conduct. *Brandon v. Lotter*, 157 F.3d 537, 539 (8th Cir. 1998). So, in order to maintain a § 1986 action, the plaintiffs would need to show that (1) the defendants had actual knowledge of a § 1985 conspiracy, (2) had the power to prevent or aid in preventing the commission of a § 1985 conspiracy, (3) neglected or refused to prevent a § 1985 conspiracy, and (4) a wrongful act was committed. *Keefe*, 785 F.3d at 1223-24; *Brandon*, 157 F.3d at 537.

Obviously, then, a § 1986 claim must be predicated upon a valid § 1985 claim. *Gatlin ex rel. Est. of Gatlin v. Green*, 362 F.3d 1089, 1095 (8th Cir. 2004); *Jensen v. Henderson*, 315 F.3d 854, 863 (8th Cir. 2002); *Steele v. City of Bemidji*, 257 F.3d 902, 906 (8th Cir. 2001). Having failed to state a § 1985(3) claim, the plaintiffs have failed to state a § 1986 claim as well.

### (iii) Intracorporate Conspiracy Doctrine

Finally, the intracorporate conspiracy doctrine also bars the plaintiffs' conspiracy claims. That doctrine precludes § 1985(2) and (3) conspiracy claims because a local government entity cannot conspire with itself through its employees acting within the scope of their employment, even if the plaintiffs allege improprieties in the execution of these duties. *Faulk v. City of St. Louis, Missouri*, 30 F.4th 739, 749 (8th Cir. 2022) (citing *Kelly v. City of Omaha*, 813 F.3d 1070, 1078-79 (8th Cir. 2016)).

Here, the complaint clearly alleges that the defendants were acting, at all relevant times, within the scope of their employment by Douglas County. *See* filing 1. There is nothing to suggest that they were acting beyond the scope

- 16 -

of their authority or for their own benefit. *See Crutcher-Sanchez v. Cnty. of Dakota*, 687 F.3d 979, 987 (8th Cir. 2012). And in the briefs, the plaintiffs' counsel leaves this argument unaddressed. *See* filing 22 at 10; filing 23. The only conclusion to be drawn is that the intracorporate conspiracy doctrine applies here.

### (d) Disposition

Accordingly, the plaintiffs' first, second, third, and sixth claims for relief will be dismissed.

### 2. *BIVENS* CLAIM

The fourth claim for relief is styled as a "Constitutional Claim for *Brady* Rule Violation Against All Defendants Pursuant to *Bivens v. Six Unknown Names Agents of Federal Bureau of Narcotics*." Filing 1 at 17. There are, again, a number of problems with this claim.

### (a) Nature of Bivens Remedy

The first is the most obvious: There's no such thing as a "*Bivens* claim" against a state or municipal official. In *Bivens v. Six Unknown Fed. Narcotics Agents,* 403 U.S. 388 (1971), the U.S. Supreme Court recognized an implied private action for damages against *federal* officers alleged to have violated a citizen's constitutional rights. *Iqbal*, 556 U.S. at 675. That implied cause of action is the *federal* analog to suits brought against state officials under 42 U.S.C. § 1983. *Iqbal*, 556 U.S. at 675-76.

In other words, a *Bivens* claim is maintained against federal officials, while a § 1983 claim is brought against state officials. *Mendoza v. United States Immigr. & Customs Enf't*, 849 F.3d 408, 416 n.3 (8th Cir. 2017); *see Bishop v. Tice*, 622 F.2d 349, 355-56 (8th Cir. 1980). Section 1983 is the appropriate and

*exclusive* remedy for constitutional violations committed by municipalities. *Bishop*, 622 F.2d at 356 n.12; *Cedar-Riverside Assocs., Inc. v. City of Minneapolis*, 606 F.2d 254, 255 (8th Cir. 1979); *Owen v. City of Indep., Mo.*, 589 F.2d 335, 337 (8th Cir. 1978), *rev'd on other grounds,* 445 U.S. 622 (1980). The plaintiffs' counsel directs the Court to no authority supporting a *Bivens* claim in this situation—and, in fact, fails to respond to the defendants on this point at all. *See* filing 15 at 22-24; filing 23 at 23-24.

(b) Failure to Allege *Brady* Violation

But even if the Court assumes an appropriate procedural vehicle to assert this claim, it fails on the merits. Pursuant to *Brady v. Maryland*, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of prosecution." 373 U.S. 83, 87 (1963). But "the *Brady* rule's overriding concern is with the justice of the finding of guilt." *Turner v. United States*, 137 S. Ct. 1885, 1893 (2017) (cleaned up). So, "there is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Strickler v. Greene*, 527 U.S. 263, 282 (1999).

Implicit in all of that is the assumption that there *has* been a verdict. For instance, *Turner* would require the Court "to examine the trial record, evaluate the withheld evidence in the context of the entire record, and determine in light of that examination whether there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." 137 S. Ct. at 1893. None of that makes any sense where there's no trial record, no description of the "withheld evidence," no proceeding, and no result. A *Brady* claim that doesn't allege evidence

- 18 -

undermining a *conviction* is self-contradictory. *See Skinner v. Switzer*, 562 U.S. 521, 536-37 (2011).

The plaintiffs' purported *Brady* claim is simply not cognizable. The plaintiffs' counsel has not identified any evidence that was allegedly withheld, much less suggested its materiality. Rather, the complaint conclusorily alleges withholding of "exculpatory evidence." Filing 1 at 17. That's just a legal conclusion without any supporting facts. Nor could the Court find that anything was actually "withheld" within the meaning of *Brady*—it's not entirely clear what the deadline is for disclosing evidence favorable to the accused, but it's surely later than the day of the indictment. *Cf. United States v. Pou*, 953 F.2d 363, 367 (8th Cir. 1992) (due process not violated by late disclosure of material).

The plaintiffs' counsel doesn't meaningfully address any of that. Rather, he provides a heading—"Plaintiffs Did Not Fail to State a Claim for Relief for Violation of Brady v. Maryland"—followed by two paragraphs discussing the discretionary function exception of the Federal Tort Claims Act that, candidly, the Court thinks might have been included accidentally because there's no other explanation for their presence. Filing 15 at 22-23. Then, after a paragraph of basic *Brady* propositions, we get the following:

> Here, **the conduct from the special prosecutor was outrageous**, he crossed the line when **he made statements implying that Gardner was a racist and a killer.** It is important to notice that in any trial if the prosecutors bring such statements into light, it would be objected to immediately because of the possible bias on the jury and the prejudicial effect on the trial. YET here Defendant did not do the statements in a court room, he made them to the public; we can only imagine the

implications and the prejudicial effect on the trial because of the possible bias on the jury. Consequently, Defendant, CLEARLY violated *Brady v. Maryland*, when he used his power to influence the public to view Gardner in a different light.

Filing 15 at 23-24 (emphasis in original).

As best the Court can tell, the plaintiff's counsel isn't actually complaining about any alleged failure to disclose exculpatory evidence to Gardner or Gardner's counsel—rather, he seems to be arguing that Franklin had a duty to disclose exculpatory evidence *at the press conference* in order to make the public aware of it. There is no such constitutional obligation. But whatever counsel is arguing, it's not a *Brady* violation.

(c) Disposition

Because *Bivins* is inapplicable here, and there was no *Brady* violation in any event, the plaintiffs' fourth claim for relief will be dismissed.

3. QUALIFIED IMMUNITY FOR CONSTITUTIONAL CLAIMS

The individual capacity defendants also argue that at the very least, they're entitled to qualified immunity on the plaintiffs' constitutional claims. Filing 13 at 8-9, 17-18. And again, they're correct.

Qualified immunity shields public officials performing discretionary functions from liability for conduct that does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Parker v. Chard*, 777 F.3d 977, 979 (8th Cir. 2015); *see Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012); *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Because a prosecutor's statements to the press may serve a "vital public function," but are not part of the judicial process, a prosecutor is protected by

- 20 -

qualified immunity (but not absolute prosecutorial immunity) when making out-of-court comments to the press. *Buckley v. Fitzsimmons*, 509 U.S. 259, 276-78 (1993).

Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly, and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. *Pearson*, 555 U.S. at 231. It gives government officials breathing room to make reasonable but mistaken judgments about open legal questions and protects all but the plainly incompetent or those who knowingly violate the law. *Parker*, 777 F.3d at 979-80.

In determining whether a government official is entitled to qualified immunity, the Court asks (1) whether the facts alleged establish a violation of a constitutional or statutory right and (2) whether that right was clearly established at the time of the alleged violation, such that a reasonable official would have known that his actions were unlawful. *Johnson v. Phillips*, 664 F.3d 232, 236 (8th Cir. 2011); *see Parker*, 777 F.3d at 980. Whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken. *Messerschmidt*, 565 U.S. at 546; *Pearson*, 555 U.S. at 244. The protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact. *Pearson*, 555 U.S. at 231.

Of course, as the Court has already found no constitutional violation here, the plaintiffs' claims fail at step one: The facts alleged do not establish a violation of a constitutional or statutory right. *See Johnson*, 664 F.3d at 236. But for the sake of completeness, the Court also finds that no right was clearly established. For a right to be clearly established, the contours of the right must

be sufficiently clear that a reasonable official would understand that what he is doing violates that right. *Parker*, 777 F.3d at 980. Clearly established law is not defined at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced. *Id.*; s*ee Seymour v. City of Des Moines*, 519 F.3d 790, 798 (8th Cir. 2008). It is unnecessary to have a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate. *Parker*, 777 F.3d at 980.

 The plaintiffs' counsel has directed the Court to no existing precedent supporting the plaintiffs' claims, nor has the Court been able to locate any—in fact, to the extent that there is any relevant authority, it cuts the other direction. *See Stockley*, 963 F.3d at 818-19. Even had the plaintiffs eked out a constitutional claim for relief, the individual capacity defendants would be entitled to qualified immunity.[2]

### 4. MUNICIPAL LIABILITY FOR CONSTITUTIONAL CLAIMS

Absent a constitutional violation by a county official, there can also be no liability for the county. *McKay v. City of St. Louis*, 960 F.3d 1094, 1102 (8th Cir. 2020). But Douglas County also argues that even if there was an underlying constitutional violation, there's no basis to hold the county liable. Filing 13 at 20.

Douglas County is not entitled to qualified immunity. *See Owen*, 445 U.S. at 657-58. But mere employment of a tortfeasor does not provide a basis for

---

[2] The issue of qualified immunity is only raised in the Kleine/Douglas County brief, but the Court finds no basis to distinguish among the individual capacity defendants with respect to qualified immunity, and the Court may raise the issue *sua sponte* where the defense is established on the face of the complaint. *See Story v. Foote*, 782 F.3d 968, 969-70 (8th Cir. 2015). The plaintiffs' counsel also had every opportunity to respond. *See* filing 23 at 13-15.

- 22 -

liability. *Irvin v. Richardson*, 20 F.4th 1199, 1208 (8th Cir. 2021). The plaintiffs may only establish municipal liability by proving that Gardner's constitutional rights were violated by an action pursuant to official municipal policy, or misconduct so pervasive among non-policymaking officials of the municipality as to constitute a custom or usage with the force of law. *Mitchell v. Kirchmeier*, 28 F.4th 888, 899 (8th Cir. 2022) (citing *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978)). Douglas County argues that the plaintiffs' allegations do not support municipal liability here. Filing 13 at 20-35.

The plaintiffs' counsel responds with the following:

## V. PLAINTIFFS DID NOT FAIL TO STATE A PLAUSIBLE CLAIM FOR MUNICIPAL LIABILITY AGAINST DOUGLAS COUNTY PURSUANT TO § 1983.

As Defendants alleged, in Nebraska, the Legislature imposes upon county attorneys the duty to prosecute criminal violations, expressly directing all county attorneys "to appear in the several courts of the county and prosecute the appropriate criminal proceeding on behalf of the state and county." Neb. Rev. Stat. § 23-1201 (emphasis added). Therefore, the Nebraska Constitution mandates that "[a]ll process shall run in the name of 'The State of Nebraska,' and all prosecutions shall be caried [sic] on in the name of 'The State of Nebraska.'" Neb. Const. Art. V, Sec. 24. However, in this text, *undoubtedly*, the Legislature is referring to the State as an entity and all the administrative entities that it conforms [sic], therefore, is [sic] implied that when Plaintiffs referred to Douglas County as a Defendant, they are making reference to the state as an entity, and thus, unequivocally, the

> Defendant Douglas County, as part of the Nebraska state enters
> [sic] in the category specified by the Legislature.

Filing 15 at 24 (emphasis in original) (corrections supplied).

That does not explain any basis for *Monell* liability. Nonetheless, the complaint does allege that Douglas County had a "policy or practice" that contributed to the alleged constitutional violations, and that Kleine and Franklin were policymakers for Douglas County. *See* filing 1 at 5, 12-20. So, the Court will evaluate those allegations: both whether the plaintiffs sufficiently alleged the existence of a policy or custom, and whether Kleine or Franklin was a policymaker.

### (a) County Policy or Custom

The plaintiffs did not plead facts showing a policy or custom. The complaint identifies no official policy, and pleading a "custom or usage" would require allegations showing (1) a continuing, widespread, persistent pattern of unconstitutional misconduct by the county's employees; (2) deliberate indifference to or tacit authorization of such conduct by the county's policymaking officials after notice to the officials of that misconduct; and (3) an injury by acts pursuant to the county's custom. *Mitchell*, 28 F.4th at 899-900.

If anything, the plaintiffs alleged the opposite: The complaint specifically alleges that "The Douglas County Attorney's Office and Douglas County, Nebraska had an established policy or practice of *not* making statements to the press which would materially impact an individual's right to a fair trial or due process of law." Filing 1 at 6 (emphasis supplied). In other words, they allege that Franklin's press conference remarks were a *departure* from the county's established policy or custom.

- 24 -

(b) Policymaker

But municipal liability may attach where "a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Ness v. City of Bloomington*, 11 F.4th 914, 922 (8th Cir. 2021); *see Pembaur v. City of Cincinnati*, 475 U.S. 469, 483-84 (1986). Although a single unconstitutional act may not always suffice to support a claim of municipal liability, an unconstitutional governmental policy may be inferred from a single decision taken by the highest officials responsible for setting policy in that area of the government's business. *Stockley*, 963 F.3d at 823. And whether an official had final policymaking authority is a question of state law. *Pembaur*, 475 U.S. at 483.

*(i) Policymaker for County or State?*

Douglas County argues that generally, a county attorney cannot establish county policy because crimes are prosecuted in the name of the State of Nebraska. Filing 13 at 21-22. There is some force to that argument. To be sure, an elected county attorney is an county officer. *See Polikov v. Neth*, 699 N.W.2d 802, 808 (Neb. 2005). But under Nebraska law, crimes are prosecuted in the name of the state, even if it's the county attorney's responsibility to do it. *See* Neb. Rev. Stat. § 23-1201(2); *see also Polikov*, 699 N.W.2d at 808.

And it's the Nebraska Attorney General who is charged by law with "the general control and supervision of all actions and legal proceedings in which the State of Nebraska may be a party or may be interested." Neb. Rev. Stat. § 84-202; *see also* Neb. Rev. Stat. § 84-203 (Attorney General is authorized to appear for the state and prosecute and defend any matter, civil or criminal, in which the state may be a party); Neb. Rev. Stat. § 84-204 (Attorney General and State Department of Justice shall have same powers and prerogatives in

- 25 -

each county as county attorney).[3] The Attorney General may, in fact, direct the county attorney to represent the state in any matter in which the state is interested or a party. § 23-1201(2).

Faced with comparable statutory schemes, courts have regularly concluded that a county prosecutor acts as a state official, for *Monell* purposes, when prosecuting crimes or otherwise carrying out policies established by the state.[4] *See Dean v. Smith*, No. 4:09-CV-3144, 2014 WL 12600052, at *2 (D. Neb. Mar. 3, 2014); *see also, e.g., Weiner v. San Diego Cnty.*, 210 F.3d 1025, 1028-31 (9th Cir. 2000); *Esteves v. Brock*, 106 F.3d 674, 677-78 (5th Cir. 1997); *Pusey v. City of Youngstown*, 11 F.3d 652, 659 (6th Cir. 1993); *Owens v. Fulton Cnty.*, 877 F.2d 947, 952 (11th Cir. 1989); *Baez v. Hennessy*, 853 F.2d 73, 76-77 (2d Cir. 1988); *Gavitt v. Ionia Cnty.*, 67 F. Supp. 3d 838, 859-60 (E.D. Mich. 2014), *aff'd sub nom. Gavitt v. Born*, 835 F.3d 623 (6th Cir. 2016); *Williams v. Fedor*, 69 F. Supp. 2d 649, 658-63 (M.D. Pa. 1999), *aff'd,* 211 F.3d 1263 (3d Cir. 2000); *Wilson v. City of Chanute*, 43 F. Supp. 2d 1202, 1215-16 (D. Kan. 1999); *Ramsay v. McCormack*, No. 98-CV-408, 1999 WL 814366, at *4-6 (D.N.H. June 29, 1999); *Jones v. Ziegler*, 894 F. Supp. 880, 893 (D. Md. 1995), *aff'd sub nom. Jones v. Wellham*, 104 F.3d 620 (4th Cir. 1997); *but see Webb v. Sloan*, 330 F.3d

---

[3] The supervisory authority of the Attorney General is what distinguishes the Eighth Circuit's decision in *Dean v. Cnty. of Gage, Neb.*, 807 F.3d 931, 942 (8th Cir. 2015), in which the Court of Appeals held that a Nebraska county sheriff is a county policymaker in the area of law enforcement investigations and arrests. Nothing in *Dean* identified any comparable "state influence" over a county sheriff. *See id.*

[4] Because neither Kleine nor Franklin asserted the state's sovereign or Eleventh Amendment immunity, the Court does not consider it. *But see, e.g., Cady v. Arenac Cnty.*, 574 F.3d 334, 342 (6th Cir. 2009).

1158, 1164-66 (9th Cir. 2003); *Altamirano v. Cnty. of Pima*, No. 15-CV-169, 2019 WL 3457696, at *4-6 (D. Ariz. July 31, 2019).[5]

Of course, the allegations here do not directly concern the charging decision, and state law—unsurprisingly—says little about any specific legal responsibility to speak at a press conference following an indictment. But to the limited extent there even is a policy on that, it's set at the state level. *See* Neb. Ct. R. of Prof. Cond. § 3-503.8(f). The Court concludes that statements to the press concerning an indictment are closely related to the prosecutorial function, and thus share its character for purposes of determining whether the prosecutor was acting as a county or state official. *Cf. Buckley*, 509 U.S. at 278. Here, under the Nebraska statutes, that's as a state official.

*(ii) Special Prosecutor*

This case is additionally complicated by the appointment of a special prosecutor. As previously noted, under Nebraska law:

> Due to the absence, sickness, disability, or conflict of interest of the county attorney and his or her deputies, or upon request of the county attorney for good cause, the Supreme Court, the Court of Appeals, or any district court, separate juvenile court, or county court before which the cause may be heard may appoint an attorney to act as county attorney in any investigation, appearance, or trial. . . .

---

[5] When performing other functions—for example, making administrative policies for their own offices—they may be local policymakers. *See Goldstein v. City of Long Beach*, 715 F.3d 750, 765 (9th Cir. 2013) (Reinhardt, J., concurring) (collecting cases).

- 27 -

§ 23-1205. And that procedure has been used, as in this case, to appoint a special prosecutor to "remove . . . perceived unfairness and promote confidence in the judicial system." *See State v. Chauncey*, 890 N.W.2d 453, 463-64 (Neb. 2017). When that happened, "the special prosecutor simply stepped into the shoes of the county attorney" with respect to Scurlock's killing. *See State on Behalf of Garcia v. Garcia*, 471 N.W.2d 388, 390 (Neb. 1991).

Accordingly, the Court concludes that it is Franklin, not Kleine, who must be the "policymaker" for the county in this case. Under the relevant Nebraska law, a special prosecutor effectively becomes the county attorney for the matter in which he or she is appointed. When Franklin was appointed as special prosecutor, Kleine lost his authority over the matter.[6]

So, even if a county attorney could ordinarily be a policymaker for a county with respect to a prosecution under state law, it's necessary to ask whether a special prosecutor can be. The Court believes not—at least, not on the facts of this case. Even though Franklin was wearing the shoes of the county attorney, it was only for a single case, and there's no basis to infer that any decisions made in the prosecution of that case represented official policy of any kind. While his "authority over his one case was considerable, his charge was too limited to make him a policymaking authority for the county." *See Brown v. Lyford*, 243 F.3d 185, 192 (5th Cir. 2001); *cf. Phillips v. Whittington*, 497 F. Supp. 3d 122, 161-62 (W.D. La. 2020).

### (c) Disposition

In sum, the plaintiffs' municipal liability claim against Douglas County fails because of the lack of a constitutional violation by any of its officials, the

---

[6] That provides an additional reason why Kleine, in his individual capacity, is not liable for the plaintiffs' non-conspiracy claims: He had no supervisory authority over Franklin as special prosecutor.

lack of a policy or custom resulting in the alleged harm, and because neither Kleine nor Franklin, under the circumstances, was acting as a policymaker for Douglas County.

### 5. Wrongful Death

Finally, the Court is left with the plaintiffs' fifth claim for relief—a state wrongful death claim.[7] Filing 1 at 18-19. The Nebraska Political Subdivisions Tort Claims Act (PSTCA), Neb. Rev. Stat. § 13-901 *et seq*., is the exclusive means by which a tort claim may be maintained against a political subdivision or its employees. *Geddes v. York Cnty.*, 729 N.W.2d 661, 665 (Neb. 2007).[8]

### (a) Intentional Tort Exception

The defendants argue that the plaintiffs' wrongful death claim is barred by the intentional tort exception to the PSTCA—specifically, § 13-910(7), which provides in relevant part that the PSTCA "shall not apply to . . . [a]ny claim arising out of . . . false arrest, false imprisonment, malicious prosecution, abuse

---

[7] The Court has considered, having dismissed all the federal questions presented, whether to exercise supplemental jurisdiction over this state-law claim. The Court recognizes that when it has dismissed every federal claim, factors of judicial economy, convenience, fairness, and comity will usually point toward declining to exercise jurisdiction over the remaining state-law claims. *Nuevos Destinos, LLC v. Peck*, 999 F.3d 641, 645 n.3 (8th Cir. 2021). But the Court chooses to exercise jurisdiction here: Despite the unusual facts, application of the Nebraska tort claims statutes is straightforward, and judicial economy calls for a decision.

[8] Despite the fact that a county attorney sometimes acts as an official of the state for some purposes, it's the PSTCA that's relevant here: The PSTCA's scope is defined by an *employment* relationship, *see* § 13-920(1), and a county attorney, a special prosecutor, and a special prosecutor's deputies are all employed by the county (unless services performed for the state are in addition to the ordinary duties of the county attorney), *see* § 23-114; § 23-1201(2); § 23-1204; § 23-1205.

of process, libel, slander, misrepresentation, [or] deceit. . . ." *See* filing 13 at 18-19; filing 22 at 12-13. Whether the allegations made by a plaintiff set forth claims which are precluded by exemptions under the PSTCA presents a question of law. *Dion v. City of Omaha*, 311 Neb. 522, 537 (2022). The Court finds, as a matter of law, that the defendants are correct.[9]

The response to this argument from the plaintiffs' counsel is unclear. For several pages counsel seems to be suggesting that Franklin's alleged conduct falls *within* the "misrepresentation" exception. *See* filing 15 at 27-29; filing 23 at 23-25. That, of course, completely "misapprehends the nature of the exceptions set forth in § 13-910"—"the exceptions set forth in § 13-910 are affirmative sovereign immunity defenses to claims brought pursuant to the PSTCA." *Harris v. Omaha Hous. Auth.*, 698 N.W.2d 58, 65 (Neb. 2005). "In other words, if a political subdivision proves that a plaintiff's claim comes within an exception pursuant to § 13-910, then the claim fails based on sovereign immunity, and the political subdivision is not liable." *Id.*

Counsel also asserts that the plaintiffs' tort claim actually sounds in negligence. Filing 15 at 30; filing 23 at 25. The Court questions whether that's a fair characterization of the complaint. In order to recover in a negligence action, the plaintiffs must show a legal duty owed by the defendant, a breach

---

[9] Franklin and the Does also argue that the plaintiffs didn't comply with the presentment requirements of the PSTCA. Filing 22 at 14; *see* § 13-919(1). Perhaps not, but such noncompliance must be raised as an affirmative defense. *Wise v. Omaha Pub. Sch.*, 714 N.W.2d 19, 22 (Neb. 2006). So, it can only be asserted in a Rule 12(b)(6) motion when, on the face of the complaint, allegations are included which could be the subject of the affirmative defense. *See Weeder v. Cent. Cmty. Coll.*, 691 N.W.2d 508, 515 (Neb. 2005). And in this case, the complaint is silent about the plaintiffs' compliance with the PSTCA. *See* filing 1; *compare Weeder*, 691 N.W.2d at 515. Accordingly, whether the plaintiff complied with the PSTCA cannot be decided on a motion to dismiss. *See id.*; *see also Wise*, 714 N.W.2d at 22.

of such duty, causation, and damages. *A.W. v. Lancaster Cty. Sch. Dist. 0001*, 784 N.W.2d 907, 913 (Neb. 2010). The complaint doesn't do much to identify a tort duty owed to Gardner, or a breach of that duty. *See* filing 1.

But even assuming a negligence claim was intended, it would fare no better. Statutes purporting to waive the protection of sovereign immunity are to be strictly construed in favor of the sovereign and against waiver. *Dion*, 311 Neb. at 540. As a corollary to this canon of construction, and in order to strictly construe the PSTCA against a waiver of sovereign immunity, the Nebraska Supreme Court applies a broad reading to statutory exemptions from a waiver of sovereign immunity such as § 13-910(7). *Id*. A waiver of sovereign immunity is found only where stated by the most express language of a statute or by such overwhelming implication from the text as will allow no other reasonable construction. *Id*.

The Nebraska Supreme Court has also observed that the language used by the Legislature in § 13-910(7) is "strikingly broad and that without qualification or limitation, it exempts from the waiver of sovereign immunity any claim arising out of the listed intentional torts." *Dion*, 311 Neb. at 540 (citing *Edwards*, 953 N.W.2d 744). The Court is to apply the "gravamen of the complaint test," under which the Court

> examines the underlying substance of a dispute in order to determine whether sovereign immunity lies. In general, the "gravamen" is the "substantial point or essence of a claim, grievance, or complaint" and is found by examining and construing the substance of the allegations of the complaint as a whole without regard to the form or label adopted by the pleader or the relief demanded. Thus, to determine the gravamen of the complaint, we look to whether the plaintiff has alleged an injury

independent of that caused by the excluded acts, i.e., that the injury is linked to a duty to act that is entirely separate from the acts expressly excluded from the statutory waiver of sovereign immunity.

*Id*. at 540-41. "Plaintiffs cannot circumvent the exemption of § 13-910(7) through artful pleading that relies on a semantic recasting of events." *Id*. at 541-42.

What the plaintiffs' counsel is suggesting is precisely such a semantic recasting. The gravamen of the plaintiffs' complaint is clearly defamation:

(1)   a false and defamatory statement concerning the plaintiff;

(2)   an unprivileged publication to a third party;

(3)   fault amounting to at least negligence on the part of the publisher; and

(4)   either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication.

*Norris v. Hathaway*, 561 N.W.2d 583, 585 (Neb. Ct. App. 1997) (citing Restatement (Second) of Torts § 558 (1977)); *see, e.g.*, *Moats v. Republican Party of Nebraska*, 796 N.W.2d 584, 593 (Neb. 2011); *cf. Jill B. v. State*, 899 N.W.2d 241, 262 (Neb. 2017) (relying on Restatement (Second) of Torts § 310 to define scope of "misrepresentation" exception to waiver of immunity under State Tort Claims Act). And "emotional disturbance or bodily harm" proximately caused by the defamation may be actionable "special harm." Restatement (Second) of Torts § 622, cmt. a.

That's precisely what the plaintiffs pleaded: false and defamatory statements, published to the public, resulting in injury including bodily harm. *See* filing 1. Even if done negligently, that would fall within the scope of the tort of defamation, which can be committed with "fault amounting to at least negligence." *See Norris*, 561 N.W.2d at 585. Accordingly, because the statements at issue were spoken, they fall squarely within the "slander" exception to the waiver of liability under the PSTCA. *See Barry v. Kirkland*, 32 N.W.2d 757, 758 (Neb. 1948) ("slander" is spoken defamation); *see also Franklin v. Dep't of Health & Hum. Servs.*, No. 8:21-CV-87, 2022 WL 72043, at *2 (D. Neb. Jan. 6, 2022) (defamation is an intentional tort within the effectively identical exception of the Nebraska State Tort Claims Act, Neb. Rev. Stat. § 81-8,219(4)); *Harrington v. Strong*, 363 F. Supp. 3d 984, 995 (D. Neb. 2019) (same).[10]

(b) Elements of Negligence

Kleine and the John Doe defendants also argue the plaintiffs have failed to plead a negligence claim as to them because they owed no duty to Gardner to prevent Franklin's remarks. Filing 13 at 19-20; filing 22 at 15-18. As previously noted, to recover for negligence, the plaintiffs must show a legal duty owed by the defendants to Gardner, a breach of such duty, causation, and damages. *See A.W.*, 784 N.W.2d at 913. The duty in a negligence case is to conform to the legal standard of reasonable conduct in the light of the apparent risk, and whether a legal duty exists for actionable negligence is a question of law dependent on the facts in a particular situation. *Id.*

---

[10] The Court has also considered the possibility of a false light invasion of privacy claim, but on these facts such a claim would be sufficiently duplicative to be subsumed in the defamation claim. *See Harrington*, 363 F. Supp. 3d at 995; *Moats*, 796 N.W.2d at 597-98.

The defendants argue, correctly, that the plaintiffs' allegations establish no tort duty on their part. Their alleged conduct is that of non-feasance—that is, inaction rather than action. *See Bell v. Grow With Me Childcare & Preschool LLC*, 907 N.W.2d 705, 715 (Neb. 2018). An actor ordinarily has a duty to exercise reasonable care when the actor's conduct creates a risk of physical harm, *A.W.*, 784 N.W.2d at 915, but the failure to rescue or protect another from harm is not conduct creating a risk of harm and does not give rise to a duty of care, *Bell*, 907 N.W.2d at 715. The alleged misconduct in this case by Kleine and the Doe defendants did not *create* any risk of physical harm.

That does not end the duty inquiry, because there are exceptions to the no-duty rule when another recognized affirmative duty is applicable, generally arising from special relationships that have been determined to justify imposing an affirmative duty to act. *See Bell*, 907 N.W.2d at 715-16. The plaintiffs' counsel doesn't identify any special relationship here. *See* filing 15 at 30; filing 23 at 25. Nor could he, given that "these special relationships have in common the characteristic that the actor is in a position to exercise some degree of control over the other person." *Bell*, 907 N.W.2d at 716. And as already explained, none of the other defendants were in a position to control Franklin here.

### (c) Disposition

The plaintiffs' wrongful death claim is barred by the intentional tort exception of the PTSCA, and also fails to state a negligence claim as to Kleine and the Doe defendants. The plaintiffs' fifth claim for relief will be dismissed.

## V. CONCLUSION

As explained above, the Court finds that the plaintiffs' have failed to state a single viable claim for relief. Most of their claims are defective in more

than one way. There is absolutely no legal basis to conclude that Franklin or anyone else is liable, under federal or state law, for Franklin's alleged braggadocio at his press conference. For all of the foregoing reasons, the plaintiffs' complaint will be dismissed.

IT IS ORDERED:

1.    The motion to dismiss filed by Kleine and Douglas County (filing 12) is granted.

2.    The motion to dismiss filed by Franklin and John Does #1 and #2 (filing 21) is granted.

3.    The plaintiffs' complaint is dismissed.

4.    A separate judgment will be entered.

Dated this 31st day of May, 2022.

BY THE COURT:

John M. Gerrard
United States District Judge